Good morning, your honors. Joshua Davis for Plaintiff's Appellants, and I represent approximately slightly over 450 used car dealers, and they buy vehicle history reports, VHRs, from the defendant Carfax, who's the dominant Why don't I start? Sure. There are four errors that we think, primary errors. And also, how, when you do that, how the district court's failure, well, the district court's criticism of your expert and your expert witness's testimony, how that would fit into the sub-market? Why don't I start there? So big picture, subject to a stipulation and order, which the parties entered in the court ordered, relevant market and market share, relevant market and market power would be taken as resolved in plaintiff's favor. And part of that were allegations about two sub-markets. And the district, the court's opinion below indicated that it recognized that not only was there a market defined as VHRs, but there were two sub-markets, including franchise dealers and independent dealers. And specifically in regard to the sub-markets, the plaintiffs alleged that the defendant Carfax had a 90 percent market share, therefore monopoly power in those markets. And in each of them, there's a single The two sub-markets added together are not the whole market. They're just... The two, yeah, that's great. I apologize for not being clear about that. So there are two sub-markets. They are made up of dealers, franchise dealers, one, and independent dealers, two. The purchases that go online, they're not... So consumer purchasers are not included in that. Neither are so-called big purchasers, business and insurance group purchasers. And so one answer is that the trial court, while it recognized the allegations were there in regard to the sub-markets that should be taken as true, it ignored those sub-markets for purposes of summary judgment. And the short answer is, all of the analysis that the court did would be, if one looks at just the sub-markets, virtually all of it, with the possible exception of whether the so-called NIMVDIS reports are part of the relevant market. But putting that aside for a moment, much of the court's analysis then would be inapplicable because... I don't know if I follow that. Sure. One of the things the court found was that the expert failed to include in his calculation all VHRs containing the minimum NMVDIS. NMVDIS, the National Motor Vehicle Title Information... Yes, specified information. Yes. And as to franchise dealers, erroneously included non-exclusive CPO agreements. So I'm not sure why the same defect that the district court identified for the overall market didn't apply to these sub-markets. Help me out. Okay. So the CPO agreements would not be relevant to the independent dealers. But they are to the... But they would be relevant to the franchise dealers. That's — that is true. So... Isn't the failure to include all VHRs containing the minimum specified information a defect that applies across the board? That would. That was the one exception that I had in mind. But yes, so in regard to the franchise dealers, the CPO information would be relevant. It is crucial to point out that in calculating foreclosure share, Dr. Singer did not include any foreclosure share to the C... did not attribute any foreclosure to the CPO agreements for the years 2008 through 2011. So that data, the argument about that, has no applicability to 2008 through 2011 and whether there was an adequate showing of foreclosure share for those years. So I want to be clear about that. In terms of the NIMVDIS versus whether that is in the relevant market or not in the relevant market, very important to note that in two paragraphs — well, in a series of paragraphs, plaintiffs made allegations that were inconsistent with treating NIMVDIS reports as part of the same market as VHRs. And specifically, plaintiffs alleged that Carfax had 90 percent market share in a series of allegations. That is not consistent with treating NIMVDIS reports as part of the VHR market. And second, in two paragraphs specifically, plaintiffs defined VHRs, these privately sold VHRs that are the relevant market, as having additional information beyond the NIMVDIS information. And those paragraphs are 487 of the second amended complaint and paragraph 5, which defines VHR to include service and repair records. The NIMVDIS information, that data, doesn't include service and repair information. That is collected at the cost of tens of millions of dollars a year by Carfax and Experian. And I want to be very clear about what happened here because there was a stipulation and order that was designed to limit the issues that the plaintiffs had to litigate, to streamline litigation. And it said that plaintiffs would prevail on relevant market and market power. And that meant that Carfax, for purposes of the summary judgment motion, had a 90 percent market share. It also meant that NIMVDIS data, reports based purely on NIMVDIS data, were not part of the relevant market. And as I said, there are allegations in paragraphs 5 and 487 of the second amended complaint that confirm the 90 percent market share, and therefore inconsistent with the market that the trial court defined. Was the second amended complaint as clear as it should have been on that? Because the district court didn't interpret the second amended complaint that way. So clearly not clear as it should have been. I think the literal meaning of the complaint is not really debatable. I think part of the confusion is that when Carfax originally moved for summary judgment, it did a foreclosure share analysis. It did it only for the years 2012 to 2014, which gives rise to another basis for reversible error. But the foreclosure share analysis it did at that stage used a definition of the market that did not include NIMVDIS reports. That was consistent with plaintiffs' argument. Plaintiffs, then in opposing, didn't focus on that issue because Carfax hadn't raised it. Carfax raised it for the first time in reply. There is no oral argument. Plaintiffs don't get another brief. For the first time, Carfax invites a violation of the stipulation and order that says market share and market power would be — I'm sorry, market power and relevant market would be resolved in plaintiff's favor. So it's not that surprising that the court became confused, because it was an argument — We asked for a further surreply. We asked for the opportunity for a surrebuttal expert report, and the expert report did address these issues. I do not believe below that we asked for the opportunity of a surreply. Thank you. I know you want to reserve time. Let's hear from your adversary. Good morning, and may it please the Court. James Cooper from Arnold & Porter on behalf of the Appellee Carfax. I want to address this sub-market point, but I think it might be useful for me to start by just talking about what the agreements are that are at issue. We have — there are basically two types of agreements, the CPO agreements, which are certified, pre-owned, used cars. Those are agreements between Carfax and the car manufacturer. The court invented the term pre-owned. This is genius. It's like the dentist who says this is going to just pinch a little bit. It's utterly brilliant, but go ahead. I'm sorry. Don't — give him another chance. It's fine. Thank you, Your Honor. So that's one group of contracts that the plaintiffs alleged were foreclosing. The district court found that the majority of those contracts were short-term and therefore could not have been foreclosing. That's one of the basis of the court's decision, because the ex — their expert included those, the effects of those contracts in his analysis and didn't make a provision for not including them. They haven't — on the — on appeal, they don't argue that Judge Nathan got it wrong in terms of the term. They — they argue that there's some other reasons why we shouldn't be concerned about it, but they — they don't argue — they don't dispute the district court's finding with respect to the CPO agreements. The other contracts at issue involve two websites, autotrader.com and cars.com, and they're basically three types of conduct in those agreements. One is that Carfax would be the exclusive VHR that would be advertised on what we call banner ads, which are the ads around the substance of a webpage. So they're not specific to the content of the VHR that's going to be advertised in that space. It would be Carfax. The judge found that that was not foreclosing, relying on CDC technologies and the Wellnext decision, which is a southern district decision. That's just advertising. There were other ways for Carfax's competitors to advertise their products, so there was no bottleneck there, no foreclosure. The second type of — and, by the way, appellants don't contest that either on appeal. The second type of conduct was if somebody advertised a used car on these websites, and we should be clear, these are — these websites don't sell cars. Autotrader.com doesn't sell cars. It's basically an online version of classified ads. They collect people — people who have cars put listings on that website that they're selling their car. It's a collection of advertisements for cars for sale. So the second type of conduct was that if somebody advertised a used car for sale and there was no vehicle history report, Carfax would provide a little image, a badge, that you could click on if you wanted to buy a VHR for that car. So, for example, Judge Sack, if you were looking for a used car and you were on the website and you were interested in having a vehicle history report on the car that you were looking at, you might be intrigued by that advertisement and you would click on it and you'd go to Carfax — it'd take you to Carfax's website and you'd have an opportunity to buy a VHR. Judge Nathan found that conduct, too, was not foreclosing, and I don't think that's disputed on appeal either, which brings us, really, I think, to what remains at issue, which is the agreement that when a seller of a used car has already purchased a VHR for that car — so if, Judge Sack, you were selling a used car and you had purchased a VHR or if you were a used car dealer and you already had purchased a VHR, you might like to let — to advise your customers or people interested in that car that there is a VHR that would already be available to them for free, and the agreement between Carfax and Auto Trader & Cars put a badge on the website, again, that would send you to Carfax's website and you could look at the free VHR for that car. Your adversary said that in your papers, in your initial round of papers, you had assumed that these NIMVDIS reports were outside the relevant market. Is that true? So, not exactly. So, Professor Willig, who was the expert on behalf of Carfax, did an initial foreclosure analysis. We — he outlined also the reasons why, looking at the rest of the record, there was no foreclosure, but then — and one of those reasons, by the way, was putting a badge that links to a VHR is not foreclosing. It's just like advertising like the other forms of conduct that Judge Nathan found were not foreclosing. But putting that aside, Professor Willig said, notwithstanding that, that we don't think it's foreclosing, he did an analysis, and what he looked at, he did not attempt to look at the whole market. One of the — one of the problems was that there is no evidence, there was very little evidence in the record, and this was plaintiff's burden, to develop an estimation or to provide evidence about what the size of the entire market is. Instead, what Professor Willig did was he said, we have data from Carfax on what they refer to as a VIN level, so vehicle identification number. Every car has a unique number. And Professor Willig had data from Carfax for every VIN that was submitted as a CPO car to Carfax, and every VIN that was on one of those two websites, and he compared, he basically looked at those unique VINs in the allegedly foreclosed — involved in the allegedly foreclosed contracts, and compared — he assumed each one of those advertisements was actually a sale of a VHR that would be foreclosing. In other words, nobody else could — would buy a VHR from any other company for that car. So he assumed that they would be foreclosing, and then he compared that not to the entire market, because as I said, plaintiffs didn't develop evidence about that. Instead, he compared that to Carfax's own sales of VHRs. In other words, what percentage of — of the VINs that are listed on the — or that were involved in the CPO programs or listed on the websites, did that make up of Carfax's sale of VHRs? Putting aside the fact that Carfax's competitors are selling lots of VHRs, and the result of his study was 23 percent in one year and 20 percent in the other year. So — So he looked at a much narrower — He wasn't trying to define the market. He looked at a much narrower set of circumstances. Just Carfax — just — we knew when we had the data, and this is one of the reasons why we pursued this early summary judgment process, rather than have to take the depositions of 500 car dealers and — there was just going to be a huge amount of litigation. We knew that even as a share of our own VHR sales, putting aside the rest of the market, it wasn't sufficient. That's why we wanted to get those facts in front of the Court as soon as we could. I want to just make sure I address submarkets before my time expires. So there are a number of points on submarkets. First of all, I'm sure the Court is aware the district court does not have to resolve or write, in her opinion, on every issue that's presented. On submarkets, the evidence we put in was, first of all, submarkets are not economically relevant to the question of foreclosure, where the product is the same. The economic issue in foreclosure is, does — do the foreclosed parties have enough space in the market to reach a competitively efficient scale? In other words, is there enough room to sell the product that they can build the company to compete and be a constraint? Well, you can have 100 percent control of a very small submarket, and it won't matter. If the same product is being sold — so if we had a geographic market and hot dogs downstairs were one narrow geographic market, but there are hot dogs around the rest of the city that are being sold, and you could sell your hot dogs somewhere else in order to reach the competitive scale that would allow you to compete out in front of the courthouse, that — that would not be foreclosing. And there's no allegation here and no evidence in the record that these products are different. Independent dealers buy the same VHRs that franchise dealers buy. The products are the — are the same. So, first of all, is it — To that extent, is — am I to understand you that you think the district court, by the overall market, which the district court plainly addressed, really adequately dealt with all the submarket issues? Is that your position? Yes. That's correct. Okay. Let's — let me let you continue with your argument. Okay. So that — the first point was, as an economic matter, where the products are the same, the submarkets are — here are not relevant. The second issue, which I think Your Honor raised, was this question of the flaws in the Plaintiff's Expert Report and how they play out in the submarkets. And I'm not sure where we came out after Appellant's counsel spoke. I think he conceded that the flaws apply, by and large, apply to the submarkets. So the — the CPO agreements, certainly the inclusion of those in the analysis applies to franchise dealers. The question, as — Except he thought that since they hadn't been factored into a few years of the experts' report, it didn't matter. Do you want to address that? So what I would say about that, Your Honor, is they — they certainly — there's no dispute that they were factored into some other years. Some other years. Yes. And so what are we to make of the experts' failures? I — I respectfully submit that's not my issue. But let me get back to the — the other — I think the most important failure here was that for the years that — that the CPO agreements were not included, Dr. Singer failed to include data on the whole rest of Carfax's VHR sales. So that's the so-called big — the banking insurance business. They buy a lot of VHRs. It's consumers. They buy a lot of VHRs. And so those failings would also apply. Finally, I would just say, and we noted this in our brief, there's — the question of what submarkets, there's a difference in the language. When the case came up on appeal in the briefing, appellants defined the submarkets as being consumers versus dealers, and then it changed on the reply brief. And so for that reason as well, we think the submarket issue. In the reply brief, they went back to franchise versus — Because there's no customer market pleaded in the complaint. Consumer. There's — I don't know why. I don't know why they did that, Your Honor. Okay. Thank you very much. Counsel. A lot of ground to cover, and I apologize if I go a bit quickly. But on the big data, it is not true that that is at all relevant to the submarkets. The big data — the submarkets are limited to sales to dealers, and by definition, the big and consumer data does not fall within that market. In terms of the analysis of the submarkets, the question — a submarket means that control of that submarket is sufficient to raise prices above competitive levels. That is what it means to have a submarket and market power. And therefore, to have foreclosure within that market, it's sufficient then if that foreclosure enabled Carfax to raise its prices above competitive levels. And so not addressing those arguments, this is not just a small argument that wasn't addressed by the trial court. This is an independent basis for defeating summary judgment for those two submarkets. I apologize that you had stipulated to what the market was and that it wasn't the submarkets. How did you make it clear to the trial judge that you were, indeed, pursuing submarkets? Because I understood the district court to think that it had been given a stipulation by the parties that was going to control this summary judgment to hold you to it. Right. And we wanted to be held to it. We were supposed to prevail. A couple of things. On the submarkets, the trial court actually did not say that. The trial court recognized the submarkets. It just — when it came to the later analysis of foreclosure share and foreclosure of competition, it didn't address the submarkets. But actually, the trial court said that it recognized that those were — those were market allegations that should be taken as true. It did not rule against the plaintiffs on that issue in the trial court. And then why it didn't address those later on is more difficult for me to say. I do want to — in terms of this initial stipulation and order, really important. Opposing counsel said that plaintiffs had an obligation to estimate the size of the market. The burden was on them. That is precisely what we didn't have to do because of the stipulation and order. The stipulation and order relieved us of that precise burden, and we didn't get the discovery. We had very limited discovery because this was all supposed to be made more efficient. And now, on appeal, suddenly CARFAC says, well, we stipulated that we have monopoly power, and we stipulated that — to the markets as you've defined them, and now they're complaining that we didn't develop a full record on that issue. We did develop a sufficient record on that issue to establish that the trial court was wrong, that NIMVDIS reports are not, in fact, in the same market as VHR reports. They cost half or less as much. CARFAC's internal records show that it only thought of Experian as, quote, unquote, the other guy. There were only two competitors. VHRs were different. Everybody knew this. So in order for us to lose its summary judgment, what had to happen is what did happen, which was not only did the — the stipulation was plaintiffs prevail on the relevant market and market power, and not only did the court not honor that due to an untimely market argument on reply for the first time, but it didn't even give the plaintiffs the opportunity to show their — that we produced the evidence. But it didn't give us a chance to argue about the evidence establishing that our allegations were right, and instead, ironically, one might even say perversely, ruled against plaintiffs without even looking at the evidence on the very issues that were supposed to be resolved by stipulation and order in plaintiffs' favor. And so if you look at the actual record, and we include some of that in the appellate briefing, it's really clear that NIMVDIS reports — nobody in the market thinks NIMVDIS reports are part of the VHR market. Nobody thinks you have to control those. CARFAX crows about the fact that it spends tens of millions of dollars converting NIMVDIS data, which is cheap and readily available and not that useful, into VHRs, and that its only competitor also spends tens of millions of dollars for that conversion. And that's expirient. And the only way we lose its summary judgment is that not only does the court not abide by the stipulation and order in our favor, it doesn't even allow us to use the evidence we were able to gather on very limited discovery, but simply rules against us directly in an argument that had so little credibility, CARFAX didn't make it in its opening brief. Thank you. Thank you very much. Thank you.